IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ADEBOLA FAGBEMI,                              )
                                             )
                                             )
                    Plaintiffs,              )        Case No. 08 C 3736
        v.                                   )
                                             )        Judge Virginia M. Kendall
CITY OF CHICAGO and JOHN SPATZ, JR.,         )
                                             )
                                             )
                    Defendants.              )

**MEMORANDUM OPINION AND ORDER**

        Plaintiff Adebola Fagbemi ("Fagbemi") filed suit against Defendants the City of Chicago

("the City") and John Spatz, Jr. ("Spatz") (collectively "Defendants") alleging that Defendants

engaged in discrimination and retaliation in violation of 42 U.S.C. § 1983 ("§ 1983"). Specifically,

Count I of Fagbemi's Amended Complaint claims that Defendants selected Jeffrey Sebek ("Sebek"),

a less qualified individual, for the positions of Acting Engineer of Water Purification ("Acting

EWP") in 2006 and Assistant Engineer of Water Purification ("Assistant EWP") in 2008 based on

Sebek's family's political connections and campaign contributions in violation of the First and

Fourteenth Amendments and § 1983. Count II alleges that Spatz retaliated against Fagbemi because

he made complaints about Defendants' selection of Sebek for these positions in violation of the First

and Fourteenth Amendments and § 1983. Pursuant to Federal Rule of Civil Procedure 56 and Local

Rule 56.1, Defendants move for summary judgment on both Counts of Fagbemi's Amended

Complaint. For the reasons stated below, the Court grants Defendants' Motion for Summary

Judgment.

## STATEMENT OF UNDISPUTED FACTS[1]

### I. Employees within the City's Department of Water Management

The City's Department of Water Management is divided into Five Bureaus, including the Bureau of Water Supply. (P 56.1 Resp. ¶ 4.) The Bureau of Water Supply is further divided into three divisions, one of which is the Water Treatment Division. (P 56.1 Resp. ¶ 4.)

#### A. John Spatz

Spatz currently serves as Commissioner of the Department of Water Management. (P 56.1 Resp. ¶ 6.) Before becoming Commissioner, Spatz served as First Deputy Commissioner between July 16, 2006 and November 7, 2006, and as Deputy Commissioner between May 1, 2002 and July 15, 2006. (P 56.1 Resp. ¶ 6.) By the end of Spatz's term as Deputy Commissioner, he oversaw the

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Defendants' Statement of Uncontested Material Facts have been abbreviated to "D 56.1 Ex. __."; citations to Fagbemi's Additional Statement of Undisputed Material Facts have been abbreviated to "P 56.1 Add. Facts Ex. ___."; citations to Fagbemi's Response to Defendants' Rule 56.1(a) Statement of Undisputed Material Facts have been abbreviated to "P 56.1 Resp. ¶ __." ; citations to Defendants' Response to Fagbemi's Additional Statement of Undisputed Material Facts have been abbreviated to "D 56.1 Resp. ¶ __."

The Court notes that the parties have failed to comply with Local Rule 56.1. That rule allows a party opposing summary judgment to file a statement of undisputed material facts consisting of "short numbered paragraphs." L.R. 56.1. Ignoring that obligation, both parties have filed statements of undisputed facts containing numerous lengthy paragraphs. Furthermore, both parties have admitted or denied certain statements, but then improperly included additional facts and arguments in their response paragraphs. Defendants also include a general objection in response to nearly all of Fagbemi's citations to the record without properly explaining or supporting that objection. Finally, both parties cite the testimony of individuals without laying the proper foundation to establish that the individuals had the requisite personal or firsthand knowledge, *see* Fed. R. Evid. 602, and include within their statements of fact unsupported, conclusory assertions made by Fagbemi and others.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees,* 233 F.3d 524, 527 (7th Cir. 2000)). "A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56. 1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). Accordingly, the Court ignores Defendants' general objections to the extent that they fail to properly develop such arguments. The Court also strikes any additional facts or arguments improperly included in the parties' response paragraphs, as well as any conclusory, unsupported assertions made by Fagbemi and others that constitute hearsay or are insufficient to create a genuine issue of material fact. *See Burks v. Wisconsin Dept. of Trans.,* 464 F.3d 744, 752 (7th Cir. 2006). Consistent with this conclusion, the Court will not consider any arguments that rely upon the excluded evidence.

Bureau of Water Supply and worked approximately 8 to 9 hours a day. (D 56.1 Resp. ¶ 6.) Prior to these positions, Spatz was an Engineer of Water Purification ("EWP"). (D 56.1 Resp. ¶ 5.) He worked approximately 8 to 9 hours a day to complete his duties as EWP. (D 56.1 Resp. ¶ 5.)

### B. Dennis Leonardo

When the City promoted Spatz to the position of Deputy Commissioner in May 2002, Dennis Leonardo ("Leonardo") became EWP. (D 56.1 Resp. ¶ 4.) As EWP, Leonardo's duties included overseeing operations at the Jardine and South Water Treatment Plants, monitoring the water treatment processes on a daily basis, monitoring the funding at both plants, and frequently communicating with the Chief Operating Engineers at both plants to ensure that work was performed on a timely basis. (D 56.1 Resp. ¶ 4.) These duties generally required him to work 8 hours a day, and sometimes longer. (P 56.1 Resp. ¶ 4.)

In June 2006, the City promoted Leonardo to the position of Acting Deputy Commissioner of the Department of Water Management, where he served until he assumed his current title of Deputy Commissioner on April 16, 2007. (P 56.1 Resp. ¶¶ 15, 31-32.) As Acting Deputy Commissioner, Leonardo was in charge of the Bureau of Water Supply. (D 56.1 Resp. ¶ 7.) His duties included ensuring that water treatment processes were proceeding, overseeing water pumping and water quality issues, reviewing and approving reports, attending meetings, working on capital projects, monitoring work activities, reviewing disciplinary matters, approving the purchase of supplies, and dealing with budget issues. (D 56.1 Resp. ¶ 7.)

### C. Adebola Fagbemi

Fagbemi has worked as a Chief Filtration Engineer within the City's Water Treatment Division since July 16, 2002. (P 56.1 Resp. ¶ 3.) As Chief Filtration Engineer, Fagbemi is in charge

of one of Chicago's two water treatment plants, where he supervises approximately 150 employees. (P 56.1 Resp. ¶ 3.)

### D. Jeffrey Sebek

The City first employed Sebek within the Department of Public Works. (D 56.1 Resp. ¶ 8.) In 1992, Sebek began working in the Department of Water Management as an Assistant Project Director. (D 56.1 Resp. ¶ 8.) On December 1, 1998, he became a Project Administrator in the Department of Water Management. (P 56.1 Resp. ¶ 11.) In this position, Sebek assisted then-Deputy Commissioner Claude Wilson. (D 56.1 Resp. ¶ 8.) When Spatz took over the role of Deputy Commissioner on May 1, 2002, Sebek began assisting him. (D 56.1 Resp. ¶ 8.)

At some point in 2002, Fagbemi asked Spatz to assign a Filtration Engineer IV to fill in as Acting Filtration Engineer V. (D 56.1 Resp. ¶ 9.) Spatz assigned Sebek to that role even though Sebek had never worked as a water chemist for a water treatment plant, ever worked in the Control Center of one of the City's water treatment plants, and did not obtain a Class A Water Operator's License until October 2006. (D 56.1 Resp. ¶¶ 2, 9.) After the union filed a grievance alleging that Sebek was performing in a union position in violation of its contract, Spatz changed Sebek's title to Acting Assistant Chief Filtration Engineer, which was not a union position. (D 56.1 Resp. ¶ 9.)

According to an Illinois State Board of Elections disclosure, Sebek's brother, Richard J. Sebek ("Richard Sebek"), gave $250 to the Democratic Party of the 14th Ward in August 1999, $250 to the Democratic Party of the 11th Ward in December 1999, $500 to the Democratic Party of the 14th Ward in September 2000, and $250 to the Democratic Party of the 11th Ward in October 2000. (P 56.1 Resp. ¶ 10.) At one time, Richard Sebek worked for the City of Chicago Department of General Services. (D 56.1 Resp. ¶ 26.) Richard and Jeffrey Sebek's father also worked for the City's Department of Public Works as General Superintendent between 1950 and 1984. (D 56.1

4

Resp. ¶ 27.)  Ginger Rugai, the alderman of the 19th Ward, was present at Sebek's father's funeral. (D 56.1 Resp. ¶ 27.)

## II. Sebek's Position Between July 2005 and January 2008

In July 2005, the Department of Water Management requested that the Department of Personnel audit Sebek's job duties and re-classify him as Assistant Engineer of Water Purification ("Assistant EWP").  (P 56.1 Resp. ¶ 13.)  Both Spatz and then-Acting Commissioner Brian Murphy signed this request form.  (P 56.1 Resp. ¶ 13; D 56.1 Resp. ¶ 23.)  The Department of Personnel put all job audits, including Sebek's, on hold, however, until sometime in 2006 or 2007.  (P 56.1 Resp. ¶ 14.)

On July 11, 2006, Spatz informed Fagbemi that "Jeff Sebek is going to be helping out Dennis Leonardo," and when Fagbemi asked if that meant that Sebek was the Engineer of Water Purification, Spatz responded "yes."  (P 56.1 Resp. ¶ 16.)[2]  Spatz told Fagbemi that although he had performed well, "they" did not like him, so Sebek would be the EWP instead of him.[3]  (D 56.1 Resp. ¶ 32.)  Fagbemi believed that politics was involved in this decision because Spatz said "they" did not like him.  (D 56.1 Resp. ¶ 32; P 56.1 Add. Facts Ex. F, p. 201.)  Less than two weeks after this

---

[2] Spatz's self-serving affidavit sworn after the close of fact discovery, and on the day Defendants' filed their Response to Fagbemi's Statement of Additional Facts, denies that he made these statements.  (D. 56.1 Resp. ¶ 18, Ex. A, ¶¶ 4-5.)  However, self-serving affidavits that are not part of the record cannot be used to create a genuine issue of material fact on a motion for summary judgment.  *Compare Palmer v. Marion County,* 327 F.3d 588 (7th Cir. 2003) ("Self-serving statements in affidavits without factual support in the record carry no weight.") *with Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 504 (7th Cir. 2004) (citing *Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir. 2003)) ("The record . . . may include the self-serving affidavit itself, provided that the affidavit 'meets the usual requirements for evidence on summary judgment-including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial.'").  Moreover, these statements are not hearsay because they constitute admissions by Spatz, a party opponent.  *See* F.R.E. 801(d)(2)(A) (a "statement is not hearsay if" it "is offered against a party and is . . . the party's own statement").

[3] As explained in footnote 2, *infra*, Spatz's self-serving affidavit contradicting this statement is not part of the record and thus cannot be used to create a genuine issue of material fact on a motion for summary judgment.  *See Butts,* 387 F.3d at 925.  Again, Spatz's statements are non-hearsay because they constitute admissions by a party opponent.  *See* F.R.E. 801(d)(2)(A) (a "statement is not hearsay if" it "is offered against a party and is . . . the party's own statement").

conversation, Fagbemi called Leonardo and told him that he understood Sebek to be the new EWP. (P 56.1 Resp. ¶ 17.) Leonardo replied "I don't know that," and when Fagbemi said he would like to be considered, Leonardo interrupted and said "there are other qualified candidates." (P 56.1 Resp. ¶ 17.)[4]

Shortly after July 2006, instructional emails and communications to Fagbemi from Leonardo dropped significantly, and were rerouted through Sebek. (P 56.1 Resp. ¶ 20; D 56.1 Resp. ¶ 20.) Leonardo told both Fagbemi and the City's other Chief Filtration Engineer Anthony Sowa ("Sowa"), that they had to follow Sebek's instructions even if they disagreed with them, and when Sowa questioned Sebek about a directive, Sebek expressed significant frustration. (D 56.1 Resp. ¶ 22.) Throughout this time, and even after Leonardo became Deputy Commissioner in April 2007, Sebek still had to obtain Leonardo's approval for all procurement requests other than requests for chemicals. (P 56.1 Resp. ¶ 22; D 56.1 Resp. ¶ 21.) Fagbemi identified several documents reflecting that the chain of command in the Bureau of Water Supply went from Chief Filtration Engineer to Assistant EWP to EWP, and knows of one Chief Filtration Engineer before him who reported to an

---

[4] The Court finds Leonardo's statements in this regard to constitute non-hearsay admissions by a party-opponent. A statement is not hearsay if it "is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." F.R.E. 801(d)(2)(D). The question then becomes whether Leonardo, who made the statement, was an agent of the City and whether the statement concerned a matter within the scope of his agency. "For an agent's statement regarding an employment action to constitute an admission, she need not have been personally involved in that action, but her duties must encompass some responsibility related to the decisionmaking process affecting the employment action." *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (internal citation omitted). Thus, where the declarant is "not personally involved in the promotional decisions at issue" and her duties do not involve or encompass any part of the process, her statements are inadmissible hearsay. *Id.* Where, however, an employee "supervised and reviewed plaintiff" or was an "advisor to the decision-maker," "participated in interviews," and "discussed employees' performance," his statements are admissible as statements by a party's agent under Rule 801(d)(2)(D). *See id.* (citing *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007)). Here, the facts establish that as Acting Deputy Commissioner of the entire Department of Water Management, Leonardo supervised and reviewed Fagbemi in a way that makes his testimony admissible pursuant to Rule 801(d)(2)(D). Moreover, his statements here directly concern a matter within the scope of his agency and employment—namely, the promotion of individuals under his supervision. *See id.*

The Court further notes that although Fagbemi's affidavit filed after the close of discovery claims that Leonardo told him that Sebek would be EWP (*see* D 56.1 Resp. Exhibit B), Fagbemi's testified in his deposition that Leonardo replied "I don't know that." Fagbemi may not use an affidavit to make statements that flatly contradict his own deposition testimony. *See Miller v. A.H. Robins*, 766 F.2d 1102, 1104 (7th Cir. 1985).

Assistant EWP. (D 56.1 Resp. ¶ 24; P 56.1 Add. Facts, Ex. F, pp. 29-34; 467-75.) Sowa confirmed that in his career at the Water Department, the typical progression was from Chief Filtration Engineer to Assistant EWP to EWP. (D 56.1 Resp. ¶ 24; P 56.1 Add. Facts, Ex. H, pp. 86-88.)[5]

Also after July 2006, the Bureau of Water Supply prepared weekly reports highlighting events of that week gathered by Leonardo and representatives from the three divisions within the Bureau of Water Supply. (D 56.1 Resp. ¶ 11.) These reports identified Sebek as "Acting EWP" or "AEWP." (D 56.1 Resp. ¶ 12.) They were prepared for the weeks of August 1, 2006 through August 7, 2006; September 5, 2006 through September 11, 2006; November 7, 2006 through November 13, 2006; December 12, 2006 through December 18, 2006; and December 26, 2006 through January 1, 2007. (D 56.1 Resp. ¶ 11.)

During this time, Sebek also sent many emails and memoranda to Sowa and Fagbemi identifying himself as Acting EWP, and others considered him to be Acting EWP. (D 56.1 Resp. ¶¶ 15, 18.) For instance, a memorandum from Staff Assistant Judith Chorak dated August 8, 2006 identified Sebek as "Acting Engineer of Water Purification," as did a memorandum to Fagbemi and Sowa dated March 13, 2007. (P 56.1 Resp. ¶¶ 23, 29; D 56.1 Resp. ¶ 13.)

In a document signed by Leonardo and Spatz in March 2007, the Department of Water Management renewed its request that the Department of Human Resources (formerly the Department of Personnel) audit Sebek's job duties and reclassify his job title from Project

---

[5] Defendants object to the testimony of Fagbemi and Sowa supporting Fagbemi's Statement of Additional Facts #24, on the ground that the record does not sufficiently establish personal knowledge. Fact # 24 states: "Chief Filtration Engineers always reported to individuals who previously held the position of Assistant EWP and would take directions from the Assistant EWP. The position of Assistant EWP was always a stepping stone that led to the EWP position." (*See* D 56.1 Resp. ¶ 24.) Although the testimony cited by Fagbemi does not sufficiently establish Fagbemi's or Sowa's personal knowledge of the responsibilities of *all* of those who previously held the position or whether it was "always a stepping stone" to the position of EWP, it does support the propositions included above (regarding specific individuals and positions about which Fagbemi and Sowa established personal knowledge through their testimony). *See* F.R.E. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.").

Administrator to Assistant EWP based on the duties he was performing at the time. (P 56.1 Resp. ¶ 30.) In April 2007, when Sowa asked Leonardo if he would be able to act up as EWP, Leonardo laughed and said "good luck." (D 56.1 Resp. ¶ 28.)[6] On May 9, 2007, Sowa sent Leonardo a memorandum asking to "act up" in the position of EWP. (P 56.1 Resp. ¶ 33.) On the morning of May 10, 2007, Sebek identified himself as Acting EWP in an email sent to Sowa and Fagbemi. (P 56.1 Resp. ¶ 34; D 56.1 Resp. ¶ 13.) Later that evening, Leonardo emailed Sowa to inform him that no one had been acting up in the position of EWP since Leonardo held that position, and that no one would be acting up in that position in the future. (P 56.1 Resp. ¶ 35; D 56.1 Resp. ¶ 17.) Aside from this May 10, 2007 email from Leonardo, neither Spatz nor Leonardo ever informed Fagbemi that the identification of Sebek as Acting EWP in his emails was incorrect. (D 56.1 Resp. ¶ 16.) After Leonardo sent this email, Sebek resumed use of the Project Administrator title and communications between Fagbemi and Sebek decreased. (P 56.1 Resp. ¶ 39.) The position of Engineer of Water Purification has remained vacant, and no candidates have been interviewed for it, since Leonardo's promotion on April 16, 2007. (P 56.1 Resp. ¶ 40.)

A federal district court appointed a Federal Monitor in *Shakman, et al. v. Democratic Organization of Cook County, et al.*, 69 C 2145, to ensure compliance with the court's orders related to the City's hiring and promotional practices. (P 56.1 Resp. ¶ 24.) At some point after Leonardo told him that he would not be able to act up as EWP, Sowa filed a complaint with the *Shakman* Monitor stating that he was denied the position of Acting EWP based on Sebek's political clout, and

---

[6] Defendants object to this statement as inadmissible hearsay. However, ;8947;8947as explained in footnote 4 *infra*, Leonardo's statements made as Acting Deputy Commissioner and Deputy Commissioner are admissible as statements by a party's agent under Rule 801(d)(2)(D). *See* F.R.E. 801(d)(2)(D); *Stephens*, 569 F.3d at 793. The Court further finds his statement to be relevant to the question of whether the City had a policy or practice of considering political affiliations in its hiring decisions. *See* F.R.E. 401.

the *Shakman* Monitor awarded him money based on this complaint.  (P 56.1 Resp. ¶ 50; D 56.1 Resp. ¶ 29.)[7]

### III.  Fagbemi's Memorandum to Chief of Staff Huberman, *Shakman* Complaint, and Request to Mayor Daley

On July 20, 2006, Fagbemi produced and copied Spatz, Leonardo, and Sebek on a memorandum addressed to "All Plant Personnel," which stated in relevant part: "[p]er phone conversation with D. Leonardo on 7/19/06, D. Leonardo is the Acting Deputy Commissioner for our Bureau (BWS), and the new Treatment Division Head is Acting Engineer of Water Purification J. Sebek."  (D 56.1 Resp. ¶ 10.)  Five days later, on July 25, 2006, Fagbemi sent a memorandum to Ron Huberman ("Huberman"), the Chief of Staff for the City of Chicago, stating: "I am requesting a promotion to be the head of the Treatment Division, whatever the title may be called.  I will also consider a more challenging assignment in other Departments, or at any of the Agencies under the City of Chicago umbrella."  (P 56.1 Resp. ¶ 18.)  The memorandum does not use the term "politics" or state that the City appointed Sebek due to "politics."  (P 56.1 Resp. ¶ 19.)  The majority of the memorandum lists bullet point highlights of Fagbemi's accomplishments, both generally and specifically in his positions as Filtration Engineer II and Chief Filtration Engineer.  (P 56.1 Resp. ¶ 19; P 56.1 Add. Facts Ex. 3, pp. 29-34.)  The memorandum then details the requirements for the position of EWP and Fagbemi's qualifications for that position.  (P 56.1 Resp. ¶ 19; P 56.1 Add.

---

[7] Much earlier, in July of 1996, when the City transferred Sowa to the Jardine Plant, Sowa inferred from a conversation with Robert Sorich ("Sorich"), an assistant in the Mayor's office at City Hall, that he was transferred because Leonardo and Spatz had more "clout" than he did.  (D 56.1 Resp. ¶ 29; P 56.1 Add. Facts Ex. I, at 66.)  The Court sustains Defendants' objection to the second part of this Statement of Additional Facts, that "Sebek told Sowa that this was a fixed deal based on Spatz's political clout," because Sowa admitted in his deposition that he cannot now remember any of the words used by Sebek during this conversation.  (P 56.1 Statement of Additional Facts, Ex. I, pp. 56-59, 61).  Thus, Sowa lacks the personal knowledge necessary to testify as to this statement.  *See* F.R.E. 602.

Facts Ex. 3, pp. 34-35.)[8] Huberman requested that Spatz review Fagbemi's complaint, which Spatz received in July or August of 2006 and subsequently showed to Leonardo. (D 56.1 Resp. ¶ 34.)

Within two months after July 2006, Fagbemi spoke to a man from Huberman's office who informed him that the department head is in charge of making promotion decisions, and that if he thought the decision was improper, he should contact the Federal Monitor and the Inspector General. (P 56.1 Resp. ¶ 24.) After receiving phone calls from Fagbemi regarding the issues that he raised in his July 2006 memo to Huberman and a copy of the memo, the Federal Monitor, Noelle Brennan ("Brennan"), sent Fagbemi a form letter on September 6, 2006. (P 56.1 Resp. ¶¶ 25-26.) The letter acknowledged receipt of Fagbemi's allegations of a violation of the court's decree in *Shakman* and noted that Brennan might pass his information along to the City's Inspector General's Office unless Fagbemi objected within 30 days. (P 56.1 Resp. ¶ 26.)

Fagbemi had meetings with the Inspector General's office and with the Federal Monitor's office in early fall of 2006 and November 2006. (D 56.1 Resp. ¶ 33.) On November 9, 2006, Brennan sent Fagbemi a second letter informing him that her office had decided to close his file. (P 56.1 Resp. ¶ 27.) On November 13, 2006, Fagbemi sent letters to both Brennan and Robert Keller ("Keller"), the City's *Shakman* Compliance Officer, making complaints that Sebek was not qualified for the position of Acting EWP. (P 56.1 Resp. ¶ 27.) There is no evidence that Spatz knew of these letters until he read Fagbemi's Complaint in this lawsuit on July 2, 2008. (P 56.1 Resp. ¶ 28.) In a letter dated November 27, 2006, Keller explained that Fagbemi's letter would be forwarded to Brennan's office. (P 56.1 Resp. ¶ 27.)

---

[8] Fagbemi's Response to Defendants' Statement of Fact # 19 recounts several specific statements in Fagbemi's memorandum to Huberman that do not refute the assertions made in Defendants' Statement of Fact # 19. The Court disregards Fagbemi's additional factual statements as they are not set forth in a Statement of Additional Undisputed Facts as required under Local Rule 56.1(b)(3)(C). *See* LR 56.1(b)(3)(C) (explaining that the opposing party's response must contain a *separate* statement "of any additional facts that require the denial of summary judgment").

Also on November 27, 2006, Spatz directed Leonardo to tell Fagbemi to terminate all remodeling on the west end of the South Water plant, which included adding a sink and shower in Fagbemi's office, as well as remodeling a data storage room, building a new office for the director of security, building an instrumentation testing center, and building a networked web training center and classroom. (D 56.1 Resp. ¶ 35.) No one provided Fagbemi with an explanation as to why he had to cease these improvements. (D 56.1 Resp. ¶ 35.)

On August 20, 2007, Fagbemi sent a memorandum to Mayor Daley's Office entitled "Request to Fill the Position of Water Treatment Division Head." (P 56.1 Resp. ¶ 41.) In that memorandum, Fagbemi requested to be interviewed for the position of EWP, stating that he believed himself to be "the most qualified candidate, bar none." (P 56.1 Resp. ¶ 41.) The minimum qualifications for the position of EWP include a Class A Water Operator's License, "seven years of progressively responsible experience in water purification operations, including four years of supervisory experience; or an equivalent combination of training and experience," "considerable knowledge of water purification procedures, policies, and regulations," and "considerable knowledge of chemical and engineering principles involved in water purification." (D 56.1 Resp. ¶ 3; P 56.1 Ex. N.) When Spatz learned of Fagbemi's memorandum, he spoke with Maureen Egan ("Egan") and Leonardo and looked into disciplining Fagbemi, but Egan informed him that Fagbemi has a right to freedom of speech and advised against disciplining him. (D 56.1 Resp. ¶ 36.)

**IV. Sebek's Current Position as Assistant EWP Beginning January 1, 2008**

Sometime after Spatz's and Leonardo's request in March 2007, the Department of Human Resources audited Sebek's job, found that he had been performing duties of an Assistant EWP, and reclassified him to his current position of Assistant EWP effective January 1, 2008. (P 56.1 Resp. ¶¶ 11, 42-43; D 56.1 Ex. 5, Confidential Exhibits 3-5 thereto.) Sebek's job duties did not change

when he assumed the position of Assistant EWP. (D 56.1 Resp. ¶ 24.) Indeed, as early as 2005 in his position as Project Administrator, Sebek had helped advise and direct plant technical staff. (P 56.1 Resp. ¶ 37; D 56.1 Resp. ¶¶ 19, 24; D 56.1 Ex. 5, Confidential Ex. 2 thereto.) Continuing when Leonardo became Acting Deputy Commissioner in June 2006 and later Deputy Commissioner in April 2007, Sebek performed several duties previously performed by Leonardo when he was EWP, including: (1) instructing plant operations, personnel, and maintenance; (2) directing Sowa and Fagbemi to perform tasks; and (3) holding weekly meetings with Sowa and Fagbemi and their staffs. (P 56.1 Resp. ¶¶ 37, 46; D 56.1 Resp. ¶¶ 19, 24.) Although Sebek does not receive acting-up pay for assisting Leonardo with these duties, he continues to perform these duties through the present. (P 56.1 Resp. ¶ 37.)

Shortly after January 1, 2008, although Sebek copied Leonardo in all emails to Fagbemi, communications from Leonardo to Fagbemi again dropped significantly and were rerouted through Sebek. (P 56.1 Resp. ¶¶ 44-45.) Fagbemi's level of contact with Sebek rose to the same level as between July 2006 and May 2007. (D 56.1 Resp. ¶ 24.) After Fagbemi filed this lawsuit in July 2008, however, Sebek discontinued his weekly meetings, and direct communications between Leonardo and Fagbemi and between Sebek and Fagbemi returned to the same levels as before July 2006 and between May and December 2007. (P 56.1 Resp. ¶¶ 47-48.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d

654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

I.      **Count I**

Count I of Fagbemi's Amended Complaint alleges that the City and Spatz selected Sebek, a less qualified individual, for the position of Acting EWP based on his family political connections and campaign contributions in violation of his right to free association under the First and Fourteenth Amendments and § 1983. Fagbemi further alleges that the City has a custom and practice of allowing candidates to be promoted to positions over more qualified applicants based on their political connections or activities.

"It is well established that hiring, firing, or transferring government employees based on political motivation violates the First Amendment, with certain exceptions for policymaking

positions and for employees having a confidential relationship with a supervisor."[9]  *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004); *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (holding that a public employee may not be promoted because of his or her political beliefs unless political loyalty is an acceptable prerequisite for the job.)  To make out his *prima facie* case of employment discrimination based on political affiliation, Fagbemi must show: (1) that his conduct was constitutionally protected; (2) that he suffered an actionable deprivation, and (3) that the protected conduct was a but-for cause of the adverse employment action.  *See Gunville v. Walker*, 583 F.3d 979, 984, 984 n.1 (7th Cir. 2009) (First Amendment political affiliation discrimination case explaining that "until the Supreme Court's recent decision in *Gross v. FBL Financial Servs., Inc.*, 129 S.Ct. 2343 (2009), plaintiffs could prevail in a First Amendment § 1983 action if they could demonstrate that their speech was a motivating factor in the defendant's decision. After *Gross,* plaintiffs in federal suits must demonstrate but-for causation unless a statute (such as the Civil Rights Act of 1991) provides otherwise.").  If Fagbemi makes this *prima facie* showing, then Defendants have the burden of demonstrating a legitimate, non-political reason for the employment decision.  *See Hall*, 389 F.3d at 762.

---

[9] The parties do not argue that either of these exceptions applies in this case.  Indeed, there is no support in the record for the proposition that Sebek's positions as Project Administrator or Assistant EWP qualified as policymaking positions or that he had a confidential relationship with his supervisor so as to qualify under one of these exceptions. *See Hall*, 389 F.3d at 762.

### A. Fagbemi's *Prima Facie* Case

### 1. Constitutionally Protected Conduct

First, Fagbemi must establish that he engaged in conduct protected under the First Amendment. Fagbemi presents no evidence that he was affiliated with a particular political party, instead basing his claim on his choice not to be involved in politics or to support a particular candidate. (*See* R. 71, p. 7.) Just as affiliation with a particular party is constitutionally protected under the First Amendment, *see Gunville*, 583 F.3d at 984, "[i]t is undisputed that political nonaffiliation is a right protected under the first amendment," *Hermes v. Hein*, 742 F.2d 350, 354 n.3 (7th Cir. 1984) (citing *Elrod v. Burns*, 427 U.S. 374 (1976)). Thus, the Court finds Fagbemi's nonaffiliation with a political party to be constitutionally protected conduct.

### 2. Actionable Deprivation

Fagbemi must next demonstrate that he suffered an actionable deprivation. *See Gunville*, 583 F.3d at 983. "Promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Rutan*, 497 U.S. at 75. Fagbemi alleges that Defendants deprived him of his right to be fairly and equally considered for promotion to the Acting EWP position, instead selecting Sebek for the position. Defendants counter that because Sebek never held the official title of EWP, and was never paid as EWP or authorized to act up as EWP, there is no genuine issue of material fact as to whether Sebek held that position. It would have been impossible for Fagbemi to suffer the deprivation of not being considered for a promotion, they argue, when the position he desired has not been filled since Leonardo vacated it.

Fagbemi has produced substantial evidence, however, that even if Sebek never officially held the title of Acting EWP, Sebek represented himself as holding that position between July 2006 and

15

March 2007 and others (including Spatz) identified him as holding that position. Indeed, when Fagbemi asked Spatz if Sebek was the new EWP on July 11, 2006, Spatz responded "yes." Multiple weekly reports prepared for the Bureau of Water Supply between August 2006 and January 1, 2007 identified Sebek as "Acting EWP," as did several emails and memoranda sent from Sebek to Fagbemi and a memorandum from Staff Assistant Chorak dated August 8, 2006. Furthermore, when Fagbemi sent a memorandum to both Spatz and Leonardo stating that "per phone conversation with D. Leonardo" Sebek was Acting EWP, Leonardo and Spatz did nothing to correct Fagbemi. It is also undisputed that, during that time and continuing into the present, Sebek has performed many of the duties previously performed by Leonardo when he was EWP, including sending instructional emails to Fagbemi and Sowa. These facts, when taken together, are sufficient to create a genuine issue of material fact as to whether Sebek was indeed promoted (or effectively promoted) to the position of Acting EWP between July 2006 and March 2007. Because Spatz told Fagbemi on July 11, 2006 that although he had performed well, "they" did not like him so Sebek would be the EWP instead of him, Fagbemi has further established a genuine issue of material fact as to whether he was deprived of a right to be fairly and equally considered for a promotion to the position of Acting EWP or EWP. *See Rutan*, 497 U.S. at 75; *see also Hall*, 389 F.3d at 762.

### 3. But-For Causation

In order to make out a *prima facie* case of discrimination based on political affiliation, Fagbemi must not only demonstrate constitutionally protected conduct and an actionable deprivation, but also that his affiliation was a but-for cause of his employer's action. *See Gunville*, 583 F.3d at 984. The burden in this regard is "not insignificant." *Nelms v. Modisett,* 153 F.3d 815, 818 (7th Cir. 1998) (quoting *Nekolny v. Painter,* 653 F.2d 1164, 1168 (7th Cir.1981)) ("A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by

showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election.").  In other words, "[i]t is not enough to show only that the plaintiff was of a different political persuasion than the decisionmakers."  *See Hall*, 389 F.3d at 762.

Defendants claim that Fagbemi cannot show that any of their actions were based on his political nonaffiliation so as to cause the constitutional deprivation at issue.  *See Gunville*, 583 F.3d at 984.  "In analyzing this issue, the threshold question is whether the defendants even knew about the political activities" of Fagbemi.  *See Hall*, 389 F.3d at 762.  A decisionmaker cannot retaliate on account of the protected activity if he is unaware of the protected activity.  *See Healy v. City of Chi.*, 450 F.3d 732, 740-41 (7th Cir. 2006) (citing *Miller v. Amer. Family Mut. Ins. Co.*, 389 F.3d 708, 715 (7th Cir. 2004)).  Fagbemi emphasizes ways in which Sebek was advantaged throughout his career, arguing that such "preferential treatment can only be explained by considering the evidence of political influence."  (R. 71 at 10.)  However, Fagbemi's only actual evidence of Sebek's Democratic political persuasion is that his brother, Richard Sebek, made contributions to the Democratic Party on four occasions.  There is no evidence either that Spatz or the City knew about these contributions or that Spatz shared his brother's political affiliation.

Moreover, in order to meet his burden, Fagbemi must present specific evidence that Defendants knew of *his* political nonaffiliation.  *See Hall*, 389 F.3d at 762 (explaining that it is not enough to show that defendants know of the chosen individual's political involvement, because "defendants still must have wanted to favor [the chosen individual over the plaintiff] because of his political involvement," and thus must have known of his specific political affiliation).  With respect to Spatz, because Fagbemi cannot rely on his own "speculation" about Spatz's opinions as proof of his knowledge or motivation, *see Nelms*, 153 F.3d at 819, Fagbemi cannot demonstrate Spatz's

awareness through his own interpretation of Spatz's vague statement that "they" did not "like" him to mean that politics influenced the promotional decision.

There is also no evidence in the record that any other decisionmaker in the City knew of Fagbemi's political nonaffiliation or lack of support for any particular political candidate. Fagbemi's memorandum to Huberman, the City's Chief of Staff, neither stated that the City appointed Sebek due to "politics" nor is there any evidence that it made Huberman aware of Fagbemi's political nonaffiliation. Additionally, there is no evidence that Fagbemi's subsequent complaints to the Federal Monitor, Inspector General, or the *Shakman* officer were sent to City employee decisionmakers. *See Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004) (the City policy makers are those who have the authority to adopt rules and conduct government, such as the Mayor and the members of the City Council). Fagbemi has thus failed to present evidence from which a trier of fact could reasonably infer awareness of his lack of political affiliation on the part of the relevant decisionmakers. *See Kelly v. Mun. Ct. of Marion County, Ind.*, 97 F.3d 902, 912 (7th Cir. 1996) (without evidence that supervisor was aware of plaintiff's decision to withdraw from politics, plaintiff failed to demonstrate that his political views were a motivating or substantial factor in his termination); *Hall*, 389 F.3d at 763 ("Hall's failure to offer evidence that would have shown that at least two of the three hiring committee members knew about the political background of the two applicants, or that the hiring decision was manipulated by one member who possessed such knowledge, dooms his case.").

Even if he could demonstrate knowledge of his political nonaffiliation on the part of Defendants, Fagbemi also must show that they took action against him because of his political nonaffiliation. *See Gunville*, 583 F.3d at 984. In doing so, Fagbemi cannot rely on "self-serving declarations based on nothing more than his own speculation." *See, e.g., Healy v. City of Chicago,*

18

No. 00 C 6030, 2004 WL 1630578, at *6 (N.D. Ill. July 20, 2004) (Hibbler, J.) (citing *Kelly*, 97 F.3d at 911). Although Fagbemi speculates that Spatz was referring to politics when he told Fagbemi that he would not be EWP because others did not like him, there is no direct evidence that Spatz was making a statement about Fagbemi's politics or that politics actually influenced the decisionmaking process. *Roger Whitmore's Auto Serv., Inc. v. Lake County, Illinois*, 424 F.3d 659, 669 (7th Cir. 2005) (even where plaintiff had evidence that defendant was "upset" that he chose not to support a certain candidate in a primary election, his evidence was not direct enough to show that his political affiliation "was a substantial or motivating factor in the modification of his towing area").

Fagbemi places great weight on Sebek's statement in his deposition that he became Acting EWP because he, Leonardo, and Spatz were all from the "South Side." Defendants object to this statement as inadmissible hearsay. As explained in footnote 4 *supra*, a statement is not hearsay if it "is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." F.R.E. 801(d)(2)(D). "For an agent's statement regarding an employment action to constitute an admission, she need not have been personally involved in that action, but her duties must encompass some responsibility related to the decisionmaking process affecting the employment action." *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (internal citation omitted). Complaints voiced by employees who are candidates for a disputed promotion cannot constitute admissions, however, because employees cannot be "agents of [defendant] for the purpose of making managerial decisions affecting the terms and conditions of their own employment." *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998). As such, Sebek cannot be considered an agent of the City for purposes of a managerial decision that directly affected the terms

19

of his employment—indeed, he is the employee who allegedly received unfair treatment. *See id.* Thus, the Court disregards this statement by Sebek as inadmissible hearsay. *See Gunville*, 583 F.3d at 985 ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment."). Even if the Court were to consider this statement, however, mere reference to neighborhood affiliation does not establish political affiliation, and Fagbemi "cannot rely on the speculation or opinions of non-decisionmakers as proof that Defendants [did not promote] him because of his political affiliation" or lack thereof. *See Nelms*, 153 F.3d at 819.

Throughout each of his complaints and this litigation, Fagbemi has continued to stress his superior qualifications for the position of EWP and Sebek's lack of qualifications. Ultimately, however, the evidence fails to demonstrate the crucial link between a decisionmaker's knowledge of Fagbemi's constitutionally protected lack of political affiliation and Sebek's alleged promotion to Acting EWP. *See Gunville*, 583 F.3d at 987 ("That the decision-makers may have been unqualified to conduct the task of restructuring . . . tells us nothing about whether the motive for the layoffs was improper. There is a sizable leap from conducting a restructuring ineptly to conducting it for improper purposes . . . . The plaintiffs have failed to create a genuine issue of fact regarding whether the defendants used political affiliation in determining who would be laid off."); *see also, e.g., McCarthy v. Chi. Park Dist.*, No. 87 C 8590, 1988 WL 56222, at *3 (N.D. Ill. May 18, 1988) (Aspen, J.) ("In the absence of proof that the employer was motivated by political affiliation in favoring one employee over another, evidence of the unfavored employee's superior qualifications coupled with identification of the favored employee's political connections are insufficient to withstand summary judgment in a First Amendment claim challenging that favoritism.") Nor does the fact that Fagbemi's colleague Sowa received money from the *Shakman* Monitor after

complaining that he was denied the position of Acting EWP based on Sebek's political clout establish that politics influenced the decisionmaking with respect to Fagbemi personally. Thus, Fagbemi has failed to present evidence that politics was a but-for cause of any unfair treatment, and, as such, has failed to make out a *prima facie* case of discrimination. *See Gunville*, 583 F.3d at 984.

### B. *Monell* Claim against City

The City cannot be held liable for § 1983 violations under the doctrine of *respondeat superior* "for an injury inflicted solely by its employees or agents." *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). Instead, the City may only be liable for a § 1983 violation if a "deprivation of constitutional rights is caused by a municipal policy or custom." *Kujawski v. Board of Comm'rs of Bartholomew County, Ind.,* 183 F.3d 734, 737 (7th Cir. 1999). In order to support a claim that "the City's policies or customs violated [his] constitutional rights," "the plaintiff must begin by showing an underlying constitutional violation." *Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009).

Because Fagbemi cannot show that Spatz or any City employee caused him to suffer a constitutional injury, *see* Section I(A)(3) *supra*, he cannot succeed in his claim against the City under *Monell*, 436 U.S. 658. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if the individual defendant "inflicted no constitutional injury," then it is "inconceivable" that the City and Police Commission "could be liable"). In order "to determine whether the [City's] liability is dependent on [that of an individual defendant], we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Thomas v. Cook County Sheriff's Dept.*, 588 F.3d 445, 456 (7th Cir. 2009). Here, like in *Heller*, the City was sued "because [it was] thought liable for [Spatz's] actions." *See* 475 U.S. at 799. Indeed, Count I of Fagbemi's Amended Complaint alleges that "[t]he City expressly ratified the acts of Spatz." (R. 32 at p. 5.) This is not a case where

Spatz could be excused from liability based on an affirmative defense or qualified immunity but still have violated Fagbemi's constitutional right. *See Thomas*, 588 F.3d at 455 (explaining that where affirmative defenses or qualified immunity could excuse an officer from liability even when he violated a constitutional right, "one can still argue that the City's policies caused the harm, even if the officer was not individually culpable"). Furthermore, even if Fagbemi's *Monell* claim could be construed to be based on the actions of City decisionmakers other than Spatz, the analysis in Section I(A)(3) *infra* demonstrates that Fagbemi has not shown the requisite level of knowledge or but-for causation to show a constitutional violation by any City decisionmaker. As such, "there is no wrongful conduct that may become the basis for holding the City liable" under *Monell*, 436 U.S. 658. *See Schor*, 576 F.3d at 779 (upholding dismissal of *Monell* claim against City because "plaintiffs [did] not allege[] any plausible constitutional violation committed by Mayor Daley or the officers" and so there was no basis upon which to hold the City liable).

Because both Spatz and the City are entitled to judgment as a matter of law on Count I, the Court grants their Motion for Summary Judgment as to that Count.

## II.    Count II

Count II of Fagbemi's Amended Complaint alleges that Spatz retaliated against Fagbemi for complaining about Sebek's selection in violation of his right to free speech under the First and Fourteenth Amendments. More specifically, Fagbemi claims that Spatz retaliated against him by promoting Sebek to the position of Acting EWP, and then later by initiating steps to create a new title of Assistant EWP beginning on January 1, 2008.

To establish that Spatz retaliated against him on the basis of his speech in violation of the First and Fourteenth Amendments, Fagbemi must make a *prima facie* showing that: (1) his speech was constitutionally protected; (2) he suffered a deprivation likely to deter free speech; and (3)

Spatz's actions were a but-for cause of his constitutionally protected speech. *See George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008); *see also Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009) (explaining that decisions holding "that a plaintiff just needs to show that his speech was a motivating factor in defendant's decision . . . do not survive *Gross* [, 129 S.Ct. 2343], which holds that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law"). If Fagbemi makes this *prima facie* showing, the burden shifts to Spatz to demonstrate that he would have acted the same way in the absence of the protected activity. *Id.* If Spatz carries this burden, then Fagbemi then "bears the burden of persuasion to show that [the defendant's] proffered reasons were pretextual and that discrimination was the real reason for the [employment action]." *Smith v. Dunn*, 368 F.3d 705, 708 (7th Cir. 2004).

## A. Fagbemi's *Prima Facie* Case

### 1. Constitutionally Protected Activity

Spatz first argues that Fagbemi has not made a *prima facie* showing that his speech was constitutionally protected under the First Amendment. Determining whether speech is constitutionally protected "is a question of law for the court." *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008). "The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Morales v. Jones*, 494 F.3d 590, 595 (7th Cir. 2007); *see also Houskins*, 549 F.3d at 490 (if an "employee spoke as a citizen on a matter of public concern," then "her interest as a citizen in commenting on the matter of public concern outweigh[s] the State's interest in promoting effective and efficient public service"). Under the framework set forth in *Garcetti v. Cellabos*, 547 U.S. 410 (2006), courts must "first decide whether a plaintiff was speaking 'as a citizen' or as part of her public job, before asking

whether the subject-matter of particular speech is a topic of public concern." *See Houskins*, 549 F.3d at 490. Then, "if the employee spoke on a matter of public concern," the Court applies "the *Pickering* balancing test, balancing the employee's interest in commenting upon such matters and the employer's interest in efficient public services." *Cygan v. Wisc. Dept. of Corrs.*, 388 F.3d 1092, 1099 (7th Cir. 2002) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968)).

### a. Speaking as a Citizen

To determine whether a public employee like Fagbemi spoke as a citizen when making a particular statement, courts look to whether he made the statement pursuant to his official duties. *See Garcetti*, 547 U.S. at 421. If so, then he is not "speaking as [a] citizen[] for First Amendment purposes, and the Constitution does not insulate [his] communications from employer discipline." *Id.*

Here, Spatz does not contend, and the Court does not find, that Fagbemi made any of his allegedly protected complaints pursuant to his official duties. Fagbemi claims that he made four separate complaints regarding Sebek's promotion to the Acting EWP position: (1) his July 2006 written memorandum to the City's Chief of Staff entitled "Deen Fagbemi: 'Presenting my Own Record'"; (2) his phone calls to and meetings with the Federal Monitor and Inspector General in the fall of 2006; (3) his letters to the Federal Monitor and the City's *Shakman* Compliance Officer dated November 13, 2006; and (4) his Memo to Mayor Daley entitled "Request to Fill the Position of Water Treatment Division Head in August 2007. Unlike in *Houskins*, where a Cook County Department of Corrections ("CCDOC") social worker was "fulfilling her responsibility as a CCDOC employee and therefore not speaking as a citizen" in filing an Internal Affairs Division ("IAD") complaint and police report, *see Houskins*, 549 F.3d at 490-91, here none of Fagbemi's complaints were made pursuant to or in furtherance of any of his job responsibilities as a Chief Filtration

Engineer–indeed, he was seeking promotion to a new position with new responsibilities.  Thus, the Court finds that Fagbemi was speaking as a citizen in each of these instances.  *See Garcetti*, 547 U.S. at 421.

### b. Matter of Public Concern

In further evaluating whether a government employee's speech relates to a matter of public concern, the Court considers the "content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  "Speech that serves a private or personal interest, as opposed to a public one, does not satisfy the standards for First Amendment protection."  *Houskins*, 549 F.3d at 491-92.  Spatz argues that each of Fagbemi's complaints constitutes a personal grievance about decisions affecting his interest in obtaining a promotion.  The Court "analyze[s] each instance of speech separately to determine its protected status."  *Cygan*, 388 F.3d at 1099.

First, Fagbemi's written memorandum to Huberman's office requests a promotion to the head of the Treatment Division or a comparable position.  Because the majority of the memorandum is dedicated to listing Fagbemi's accomplishments and job qualifications for the EWP job description, it seems "most accurately characterized as an employee grievance."  *See Cygan*, 388 F.3d at 1098 ("At bottom, we must decide whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social, or other concern to the community."). Indeed, the memorandum does not use the term "politics" or state that the City appointed Sebek due to "politics."  *See Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2002) (contrasting "normal workplace grievances," such as complaints that "race influenced what happened," which are not matters of public concern and not protected under the First Amendment, with "statements . . . offered as a political view about what legal policies the City . . . should adopt").  The form and context of

the memorandum—sent in writing "within the employer's personnel hierarchy"—further support

a conclusion that it does not relate to a matter of public concern. *See Taylor*, 214 F.3d at 792. Even

if, as Fagbemi argues, his memorandum addressed concerns shared by other employees, "the

'content, form, and context' of [his] complaints reveal that [his] purpose was to advance [his]

personal interests," and to "bring the situation to the attention" only of those "in a position to remedy

[his] personal situation." *See Phelan v. Cook County*, 463 F.3d 773, 791 (7th Cir. 2006) (affirming

district court's grant of summary judgment regarding Phelan's § 1983 First Amendment retaliation

claim).

Second, Fagbemi's complaints to the Federal Monitor and Inspector General took the form

of phone calls and in-person meetings, and there is no record of exactly what was said during those

conversations. It is undisputed, however, that his calls addressed the issues that he raised in his July

2006 memorandum and that he also sent a copy of that memorandum to the Federal Monitor.

Fagbemi does not contend that he raised any issues or complaints in these phone calls and meetings

beyond those raised in his memorandum to Huberman. Moreover, the context surrounding these

conversations—namely, Huberman's advice that Fagbemi next contact the Federal Monitor and the

Federal Monitor's letter informing him that she might share the information with the Inspector

General—reflects that the Federal Monitor and Inspector General were next in "the employer's

personnel hierarchy" to contact about these complaints. *See Taylor*, 214 F.3d at 792. Thus, the

Court finds that, like Fagbemi's July 2006 memorandum, these conversations did not pertain to

matters of public concern.

Third, Fagbemi's November 13, 2006 letters to the Federal Monitor and the City's *Shakman*

Compliance Officer asserted that Sebek was not qualified for the position of Acting EWP. These

complaints more closely resemble the type of speech that courts have found entitled to First

Amendment protection. Just as speech expressing "disagreement with [the] decision to start the second meal shift with fewer than ten officers . . . touch[ed] on issues of internal prison security in a maximum security prison," which "is undoubtedly a matter of public concern," *see Cygan*, 388 F.3d at 1100, a complaint focusing on Sebek's lack of qualification for a position that involved supervising the Chief Operating Engineers of Chicago's two water treatment plants touches on a matter of public concern. Further looking to the form and context of this speech, Fagbemi took the initiative to write this letter to the *Shakman* Compliance Officer after the Federal Monitor informed him that she had finished investigating and would be closing his file. Thus, his speech occurred outside of "the employer's personnel hierarchy." *See Taylor*, 214 F.3d at 1098. The context surrounding the *Shakman* consent decree—issued by a Federal District Court to ensure compliance with the Court's orders related to the City's hiring and promotional practices—also indicates that complaints to the *Shakman* Compliance Officer are likely to implicate matters of public concern about the City's promotional practices at large. For these reasons, the Court finds that the "content, form, and context" of Fagbemi's letters, "as revealed by the whole record," are sufficient to remove them from the category of general employee grievances. *See Connick*, 461 U.S. at 147-48.

Finally, Fagbemi's August 2007 memorandum to Mayor Daley entitled "Request to Fill the Position of Water Treatment Division Head" requested to be interviewed for the position of EWP, stating that Fagbemi believed himself to be "the most qualified candidate, bar none." There is no evidence that this memorandum contained anything more than self-serving statements and a request for a promotion, and, as such, it is "most accurately characterized as an employee grievance" not entitled to First Amendment Protection. *See Cygan*, 388 F.3d at 1098.

Thus, only Fagbemi's letters to the City's *Shakman* Officer and to the Federal Monitor are properly characterized as speech addressing matters of public concern.

### c. *Pickering* Balancing

The Court next analyzes Fagbemi's November 13, 2006 letters under the *Pickering* balancing test. *See Pickering,* 391 U.S. at 568. Under *Pickering,* the Court "balance[s] the employee's interest in commenting upon such matters and the employer's interest in efficient public services." *Cygan*, 388 F.3d at 1101 (citing *Pickering,* 391 U.S. at 568). "One very important consideration is the potential disruptiveness of the speech," along with the time, place, and manner of the speech. *Id.* (internal citation omitted). Unlike the complaints shouted across a cafeteria of 1,040 of Wisconsin's violent offenders in *Cygan*, *see id.*, Fagbemi's speech was made in writing to individuals who had received many such complaints before, and thus was made at an appropriate time, place, and manner and in a way unlikely to be disruptive. Given that the *Shakman* Officer position has been in place for some time, and was created precisely to ensure compliance with the court's orders related to the City's hiring and promotional practices, Fagbemi's complaint did not significantly impede the City's interest in delivering "efficient public services." *See id.* The Court, therefore, finds Fagbemi's November 13, 2006 letters to the Federal Monitor and the *Shakman* Compliance Officer to be protected speech under the First Amendment.

### 2. Actionable Deprivation

To establish the second element of his *prima facie* case, Fagbemi must show that he suffered a deprivation likely to deter the exercise of free speech. *See George*, 535 F.3d at 538. "'Any deprivation that is likely to deter the exercise of free speech is actionable,'" from "making fun of any employee for bringing a birthday cake to the office" to "transfer[ing an employee] to a more physically demanding and less skilled post." *See Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004) (quoting *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000)). As explained in Section I(A)(2) *infra*, there is a genuine issue of material fact as to whether Fagbemi was denied the opportunity to

compete for a promotion. *See Gunville*, 583 F.3d at 983. Being denied the opportunity to compete for a promotion as a punishment for speaking out seems much more likely to deter the exercise of free speech than being made fun of for bringing a birthday cake to the office, and as such, "the circumstances are such to make such a refusal [to consider Fagbemi] an effective deterrent to the exercise of a fragile liberty." *See Power*, 226 F.3d at 820. Thus, Fagbemi has presented material factual issues as to whether he suffered an actionable deprivation.

### 3. But-for Causation

The final element of Fagbemi's *prima facie* case requires a showing that his constitutionally protected speech (his letters to the Federal Monitor and *Shakman* Compliance Officer) was a but-for cause of Spatz's decisions to appoint Sebek as Acting EWP and to take steps to reclassify Sebek as Assistant EWP. *See Fairley*, 578 F.3d at 525-26.[10] Fagbemi first must demonstrate Spatz's awareness of this protected speech. *See Miller*, 203 F.3d at 1008 ("An employer cannot retaliate when it is unaware of any complaints."); *see also Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not sufficient that [the defendant] *could* or even *should* have known about [the plaintiff's] complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory.").

Fagbemi claims that Spatz's knowledge of his November 13, 2006 letters can be inferred from the fact that Spatz directed him to cease all remodeling work in his wing without explanation on November 27, 2006. However, "an inference of knowledge or retaliation" cannot "be drawn from the circumstances" so as to survive summary judgment. *See Healy*, 450 F.3d at 740-41 (finding that even defendant's admission to having general knowledge of the subject matter of

---

[10] The Court notes that Spatz's reliance on caselaw regarding "First Amendment retaliation based on freedom of association" in this section of his brief is misplaced (*see* R. 55 at 13) because Count II of Fagbemi's Amended Complaint alleges only that "Spatz's actions violated 42 U.S.C. § 1983 and Plaintiff's rights to *free speech* under the First and Fourteenth Amendments." (*See* R. at 7-9) (emphasis added).

complaints was insufficient to show requisite level of awareness where neither party offered evidence that she knew of the plaintiff's specific complaint on the date of the promotional decision).

Moreover, although Fagbemi claims in his brief that "preventing him from completing important remodeling" was in fact one of the actionable deprivations that he suffered (*see* R. 71 at 14), nowhere in Count II of his Amended Complaint does Fagbemi mention this remodeling, let alone plead it as one of Spatz's acts of retaliation. (*See* R. 32 at 7-10.) Indeed, the entirety of Count II claims failure to *promote* Fagbemi in retaliation for his exercise of free speech rights. (*See* R. 32 at 7-10.) Because a plaintiff may not amend its complaint through arguments in a summary judgment response brief, *see Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 664 (7th Cir. 1998), Fagbemi may not now add a claim for retaliation in the form of preventing him from completing remodeling. Furthermore, even if the Court did consider his retaliation claim based on the deprivation of ceasing remodeling, there is no evidence that Spatz actually knew of Fagbemi's November 13, 2006 complaints at the time he ordered him to cease remodeling so as to demonstrate the but-for causation necessary to set forth a *prima facie* case. *See Gunville*, 583 F.3d at 983.

Indeed, Fagbemi has presented no evidence that Spatz was aware of his November 13, 2006 complaints to the Federal Monitor and the *Shakman* Compliance Officer until reading his Complaint in this lawsuit on July 2, 2008. Spatz must have been aware of these complaints prior to the challenged actions in order for them to have "influenced the promotion decisions." *See Healy*, 450 F.3d at 740 (affirming grant of summary judgment on ground that defendant was not aware of protected complaints, and even if she were, she was not aware of them prior to the date when she approved promotion recommendations). It is undisputed that Department of Water's original request (signed by Spatz) to reclassify Sebek to the position of Assistant EWP, when Spatz first

demonstrated his intent that Sebek hold this position, occurred in July 2005, years before the complaints. Furthermore, the conversation in which Spatz informed Fagbemi that Sebek would be Acting EWP, and Sebek's subsequent characterization of himself in emails and memoranda as Acting EWP, occurred beginning in July 2006—well before the constitutionally protected complaints. Even Spatz's second request to re-classify Sebek occurred in March 2007, more than a year before Spatz read the Complaint in this lawsuit on July 2, 2008. Because there is no evidence that Spatz knew about Fagbemi's protected speech at the time of the alleged retaliatory conduct, Fagbemi's "constitutionally protected speech" cannot be said to have "motivated" his actions regarding Sebek. *See Healy*, 203 F.3d at 739; *see also Miller*, 203 F.3d at 1008.

Thus, the Court finds that Spatz is entitled to judgment as a matter of law against Fagbemi on his claim of retaliation, and grants his Motion for Summary Judgment with respect to Count II.


## CONCLUSION AND ORDER

For the reasons stated, Defendants' Motion for Summary Judgment is granted.


Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 19, 2010

31